HARRY HASKELL REEVES, Administrator, Appellant, v. FLORENE LYON et al., Appellees.

No. 44249.

FEBRUARY 15, 1938.

REHEARING DENIED MAY 13, 1938.

Ralph H. Munro and Johnson & Johnson, for appellant.

Vander Ploeg & Heer, for appellees.

MITCHELL, J.—Harry Haskell Reeves, as administrator of the estate of his father, commenced this action at law, alleging the conversion by Florene Lyon and Treacy Hart O'Conner of $9,000 par value United States government bonds belonging to the estate of A. M. Reeves. The defendants filed separate answers, in four divisions: (1) Denying generally the allegations of the petition; (2) alleging that plaintiff's intestate during his lifetime created a trust, the subject-matter of which the United States government bonds were; (3) that the defendants were joint owners and tenants; and, lastly, as to $3,500 par value of said bonds, A. M. Reeves had made a complete gift thereof to Florene Lyon, and as to $4,500 worth of said bonds, he had made and executed a complete gift to Treacy O'Conner. By agreement the cause was transferred to the equity calendar for trial. The lower court found in favor of the defendants and a decree to that effect was duly entered. Being dissatisfied, plaintiff has appealed.

A. M. Reeves, at the age of approximately 78 years, died intestate on the 15th day of January, 1936, at the home of his niece, Florene Lyon, at Pleasantville. He had been married, but some thirty years before his death he and his wife had separated. As to what happened to Mrs. Reeves, whether she was living at the time of the death of A. M. Reeves, the record is silent. There was one son—Harry Reeves—who survived him. For reasons not disclosed, the relationship between father and son was not very close. In fact, they had nothing to do with each other and the father did not even know whether the son was living. During the last two years of his life A. M. Reeves lived at the home of a niece, Florene Lyon. His physical condition was very poor. He was suffering from a goiter, with a heart affliction. Ten years prior thereto he had made his home with his niece, Treacy O'Conner. During the time that he resided and made his home with his nieces he paid them $4 per

week for his room and board. Due to his physical condition the attention and service rendered were not compensated by the amount paid. However, that question is not before us.

A. M. Reeves was the owner of certain registered government bonds, payable to himself. Some time prior to October 15, 1934, he had sent to Washington a $1,000 government bond and had the same made payable to A. M. Reeves and Treacy Hart O'Conner. It seems some difficulty developed in handling the bond payable in this manner and he consulted a banker in the town where he was living. The banker wrote to the Treasury Department at Washington to ascertain how a registered bond should be made payable in order that Reeves would have during his lifetime the interest therefrom, upon his death the principal to be paid to the party designated. The Treasury Department advised that this result might be accomplished by having the bonds made payable to A. M. Reeves *or* the donee. This information was imparted to Mr. Reeves, who then, in order to verify this, drove to the nearby city of Knoxville and consulted with a banker there. Then he had Mr. Dyer, who was cashier of a bank, send in the $1,000 bond after same had been endorsed by him and Treacy O'Conner, and directed that the same should be made payable to A. M. Reeves *or* Treacy O'Conner. At the same time another $1,000 bond was sent in, $500 of which was made payable to A. M. Reeves or Treacy O'Conner and $500 to A. M. Reeves or Florene Lyon.

At about this time it became necessary for Mr. Reeves to go to the hospital. His doctor advised an operation, suggesting that if he had any business to transact it might be well for him to look after it. Again Reeves called in his banker and directed that $12,000 worth of bonds be sent in and made payable to A. M. Reeves or Florene Lyon. At that time he stated to Mr. Dyer that he wanted the interest on the bonds during his lifetime and directed that Florene Lyon upon his death should cash a $1,000 bond and from the proceeds thereof should pay his debts and funeral expenses; that she should transfer $5,000 of the bonds to his son, Harry Reeves, if he were then living, and, if not, she should divide the money equally among certain people. As directed, Mr. Dyer sent the bonds in and they were made payable to A. M. Reeves or Florene Lyon.

In May of 1935 $7,000 worth of the government bonds payable to A. M. Reeves or Florene Lyon were called for payment

or exchange, and bonds of a new issue in the same amount, payable in the same manner, were received in exchange.

In September of 1935 $3,000 of the bonds which were payable to A. M. Reeves or Florene Lyon were sent in by the banker and were, at the request of Reeves, returned and made payable to A. M. Reeves or Treacy O'Conner and delivered into the possession of Florene Lyon. This was done at the suggestion of Florene Lyon, who said she wished to be relieved of all unnecessary responsibility and, if he desired certain of these bonds to be delivered to Treacy O'Conner, she wished he would so designate by making the bonds payable to her. At the time the transfer of these bonds was made Reeves rented a safety deposit box in the bank at Pleasantville and directed that the box be registered in the name of Florene Lyon. The bonds were kept in this box. One key was delivered to Florene Lyon, with the statement that she might have access to the box at any time so that she might remove the bonds upon his death.

After the death of Reeves, Florene Lyon sold one of the $1,000 bonds and from the proceeds paid the debts and funeral expenses. There was left a balance of $232.70, which she said she desired to use, if the court would so permit, to purchase a monument for Mr. Reeves, but, if the court held that it could not be used for that purpose, she was ready to turn over the money to the administrator. Florene Lyon had ascertained that Harry Reeves was still living. Upon his appearance she delivered to him the $5,000 of government bonds and signed the transfer of same. The bonds payable to A. M. Reeves or Treacy O'Conner were delivered to Treacy O'Conner, and the remaining bonds in the amount of $3,500 were endorsed by her, sent to the Treasury Department and new bonds in the same amount were returned payable to Florene Lyon, and are still in her possession.

I. The first and all-important question involved in this case is the claim of the appellant that there was no delivery; that, to constitute a valid gift *inter vivos* the giver must part with all present and future dominion over the property given; that there must be a delivery to the donee or to someone for the donee.

The rules of law governing cases of this kind are well defined in the Iowa decisions. The difficulty lies in applying the facts to the law. The appellant in his brief and argument cites

many cases from other jurisdictions, but for some reason or other has overlooked the Iowa cases covering the proposition involved. The authorities are not in agreement. However, in view of the fact that this court has decided this very question, we turn not to the authorities outside this State but to our own decisions to ascertain the rules of law that govern.

In the case of Davis v. John E. Brown College, 208 Iowa 480, at page 489, 222 N. W. 858, 862, this court said:

"But logically, we see no escape from the conclusion that, under the rule heretofore announced in this state, the delivery of the deed to the depositary, with intent that it shall be delivered by the depositary to the grantee named, unless recalled by the grantor, and where the grantor failed to exercise such power of recall or to revoke the power vested in the depositary, and did not evidence an intent contrary to the original one under which the deed was deposited with the custodian, and where the latter, upon the death of the grantor, delivered the deed to the grantee, there was a valid delivery of the instrument."

The rule laid down in the above-cited case is followed in Arndt v. Lapel, 214 Iowa 594, 243 N. W. 605, and in the recent case of Robertson v. Renshaw, 220 Iowa 572, 261 N. W. 645, opinion by Justice Hamilton. We quote from page 579 of 220 Iowa, 261 N. W. 645, 649:

"In the case of Arndt v. Lapel, 214 Iowa 594, 243 N. W. 605, opinion by Justice Grimm, he quotes extensively from the case of Kyle v. Kyle, 175 Iowa 734, 737, 157 N. W. 248, 249, wherein the court said:

" 'That delivery is essential to the effectiveness of a deed to real estate is elementary, but just what amounts to a delivery is sometimes a question of doubt. Ordinarily it is the simple transfer of possession of the written instrument from the grantor to the grantee with intent on part of the grantor to convey and on part of the grantee to acquire title to the property described therein. But an actual manual transfer of the paper is not necessary. A delivery may be effected by acts without words, or by words without acts, or by both words and acts. Assuming the instrument to have been properly executed ready for delivery, acts and words evincing intent to part with it and relinquish the grantor's right over it is a sufficient delivery.

Whiting v. Hoglund, 127 Wis. 135, 106 N. W. 391, 7 Ann. Cas. 224; Woodward v. Woodward, 8 N. J. Eq. (4 Halstead's Ch.) 779, 784. It may be made direct to the grantee or to a third person in his behalf. Owen v. Perry, 25 Iowa 412, 96 Am. Dec. 49; Clarity v. Sheridan, 91 Iowa 304, 59 N. W. 52; Adams v. Ryan, 61 Iowa 733, 17 N. W. 159; Matheson v. Matheson, 139 Iowa 511, 514, 117 N. W. 755, 18 L. R. A. (N. S.) 1167. In final analysis it may be said that delivery is a matter of intent, and any distinct act or word by the grantor with intent to pass the title to the grantee by transferring the deed to him or to another for his benefit is a delivery. Collins v. Smith, 144 Iowa 200, 203, 122 N. W. 839; Kneeland v. Cowperthwaite, 138 Iowa 193, 194, 115 N. W. 1026; Schurz v. Schurz, 153 Iowa 187, 190, 128 N. W. 944, 133 N. W. 683; Criswell v. Criswell, 138 Iowa 607, 609, 116 N. W. 713. It is also well settled in this and other states that a deed duly executed and deposited with a third person with directions to deliver it to the grantee upon the death of the grantor is an effective conveyance; that such a deed vests the grantee with the title, but his right to possession and enjoyment is postponed until the grantor's death. In such case the delivery which the law requires to make a deed legally effective is complete when the deed is placed in the hands of the depositary; but it does not become effective for the purposes of possession and enjoyment of the property until the time comes for the secondary delivery by the person to whose keeping it has been intrusted. Sometimes the rule is stated to be that the transfer of title is effected by the delivery made by the depositary after the death of the grantor, but such delivery takes effect by relation as of the date when the deed was placed in the depositary's hands. The result is the same on either theory.' ''

In the case of Gould v. Logan, 198 Iowa 935, at page 939, 200 N. W. 490, 492, this court said:

''We have not attempted to review all of the evidence in regard to the matter; but we have examined the same with care, and are satisfied therefrom that there is sufficient competent evidence in the record to establish beyond any fair question that the donor, during his lifetime, made a manual delivery of the several certificates of stock to the donees named, and vested in them the title to the same, even though he retained certain proprietary rights during his lifetime. The rules of law govern-

ing gifts *inter vivos* are of ancient origin, and have been frequently recognized under a great variety of circumstances. No two cases are exactly alike in their facts.''

In Leedham v. Leedham, 218 Iowa 767, at page 770, 254 N. W. 61, 62, the court quotes from the case of Reed v. Copeland, 50 Conn. 472, 47 Am. Rep. 663, as follows:

'' 'The execution of an instrument declaring an intention to make a present gift to him, or a declaration of trust in his favor, is enough to constitute a gift which a court of equity will uphold and enforce.'

''But it is urged that, so long as the assignment was not delivered during the lifetime of Frank W. Leedham, it was not effective. It has long been the rule in this state that a written instrument conveying property may be placed in escrow with directions to the holder to deliver the same on the death of the grantor, and that, if this escrow agreement is carried out, it makes an effectual delivery and passes title to the grantee which relates back to the first delivery. The last discussion we had of this proposition was in Davis v. John E. Brown College, 208 Iowa 480, 222 N. W. 858, where our previous holdings are fully reviewed. The aforesaid Brown College case was much stronger than the present case, because in that case the grantor reserved the right to recall the deeds, but we held that, in view of the fact that she never exercisd this right and the deeds were, in accordance with the escrow agreement, delivered after her death, it carried a good title to the grantee.''

The facts in the case at bar are stronger than in any of the cited cases, and the evidence is clear and convincing.

■■■ Did A. M. Reeves intend to make a gift of these bonds to Florene Lyon and Treacy O'Conner, and was there an effective delivery? Both of these questions upon the record before us must be answered in the affirmative. Here we have a man advanced in years, whose journey along the road of life had been made happier by these two ladies. Apparently no one else was vitally interested in his welfare. True, he had a son, but he was somewhere unknown to the father. The father did not even know whether the son was living. Mr. Reeves himself had these bonds registered in the name of A. M. Reeves or Florene Lyon, or Treacy O'Conner. He had this done for the specific purpose

that he might have the interest therefrom during his lifetime and these two nieces might receive the balance after his death and the payment of certain amounts he had specified, including $5,-000 to his son, Harry Reeves. He turned over the bonds to Florene Lyon and secured for her a safety deposit box in the bank, registered in her name, with the key in her possession. There is no question in this record as to what happened, nor can there be any question of the intent of A. M. Reeves to make these gifts, for we have here the evidence of disinterested parties as to just what took place. In addition, there is the fact that Reeves during his lifetime had his banker write to the Treasury Department to ascertain just how this matter could be arranged. The letter is in evidence. Reeves followed the instructions of the department and had the bonds registered in the name of A. M. Reeves or Florene Lyon, with instructions that certain of the bonds after his death were to be delivered to Treacy O'Conner. Later, at the request of Florene Lyon the bonds that were to be delivered to Treacy O'Conner were changed by sending them in to the Treasury Department and registering them in the name of A. M. Reeves or Treacy O'Conner.

In the case of Andrew v. Citizens State Bank, 205 Iowa 237, at page 243, 216 N. W. 12, 14, we find:

"Appellant also insists that the burden was upon Hazel Pent to allege and prove that a gift of the certificate was intended and made to her by her mother. While no evidence was offered for that purpose, we think the necessary inference from matters appearing in the record is that Hazel Pent was a resident of Illinois. Her father resided in Humboldt County, and her mother in Ohio. The certificate was lawfully payable to her after her mother's death, upon the surrender thereof to the bank issuing it. Section 9267, Code of 1924. No other reason for the mother's making the certificate payable to herself or daughter than that she intended her to receive the money, unless paid out on her own order, is suggested. The fact that the certificate remained unpaid and unchanged is some evidence of the mother's intention."

In addition to the manner in which these bonds were made payable, we think one of the outstanding things is that A. M. Reeves himself secured a safety deposit box at the bank which he had registered in the name of Florene Lyon and that to Florene

Lyon he delivered one of the keys. In this box Florene Lyon placed these bonds, and that is where they were at all times, including the time of his death. Clearly, under this record A. M. Reeves gave these bonds to Florene Lyon and Treacy O'Conner. He delivered them to Florene Lyon and in her possession and in her safety deposit box they were kept. The case does not depend upon the evidence of parties interested but upon that of a disinterested witness, a man of business experience, who told the story so that no one could doubt it. Add to this the manner in which the bonds were registered; that they were kept in the safety deposit box of Florene Lyon.

■■■ II. Appellant says that whenever two persons have come into such a relation that confidence is necessarily reposed by one and influence which naturally grows out of that confidence is possessed by the other and is abused or exerted to obtain advantage at expense of confiding party, the person so availing himself of his position will not be permitted to retain the advantage. With this statement of the law we agree; the difficulty is that no such facts present themselves in the record before us. Instead of showing that Florene Lyon abused the confidence that her uncle had placed in her, the record shows that she was that type of an individual who carried out to the very letter the wishes of her uncle. The bonds were in her possession; all but the ones payable to Treacy O'Conner were payable to her. Her uncle wanted $1,000 cashed and that part necessary to pay his debts and funeral expenses expended out of that sum. Florene Lyon did that. Her uncle wanted $5,000 given to his son, Harry Reeves, if he were still living, and Florene Lyon went to the work and expense of locating the whereabouts of this son. And, when she found him and ascertained that he was the son, she turned over to him the $5,000 as directed. Had she been the type of an individual who desired to take advantage of the position she was in, the opportunity to do so was present; she could have forgotten about the fact that $5,000 of the bonds were to be turned over to Harry Reeves, the son, and Harry Reeves would probably never have known a thing about it; in fact, he perhaps would never have known of the death of his father for he did not know it until Florene Lyon notified him. She was not, however, that type of an individual; she would not stoop to that manner of doing business. Instead,

she did everything that her uncle, A. M. Reeves, directed should be done. The lower court in its finding said:

"But after hearing Mrs. Reeves (Lyon) and watching her on the witness stand, and taking her entire conduct and deportment in this whole matter, including the hunting up of this son, and giving the $5,000.00 to Harry, and her conduct afterwards; turning over all the other papers in the box without any investigation as to what they were. There were some papers there that had she been of a somewhat different type, she probably would have taken charge of. I have the utmost confidence in everything she said. And I believe every word she said."

After a careful reading of the record we too come to the same conclusion the trial court did, that Florene Lyon told the truth.

■■■ III. The appellant also claimed the testimony elicited from the witnesses, Florene Lyon and Treacy O'Conner, on cross-examination, was not proper, and that the witnesses were not competent to testify under the dead man statute. Code 1935, section 11257.

Let us look at the facts.

After the appointment of Harry Reeves as administrator of his father's estate an order was secured by him, ordering Florene Lyon to appear in a discovery proceeding as to property claimed to be held by her, belonging to the estate. She appeared and was examined at length in regard to the transactions covering these bonds. At the time of the trial of this case it was stipulated that, if Clare Hendrixson, the official short-hand reporter who reported the testimony of Florene Lyon in the discovery proceeding, were present upon the trial of this cause, he would testify that at said hearing Florene Lyon testified as shown by the official transcript filed in the office of the clerk of the district court, in the matter of the estate of A. M. Reeves, which transcript was identified as an exhibit and offered in evidence. From this transcript appellant read certain questions and answers, omitting certain questions and answers, and the remainder of the testimony as shown by the transcript was offered in evidence by the appellees.

It is fundamental that where admissions are made by a party and offered in evidence, the entire conversation bearing upon the matters inquired about is admissible.

In the case of Baker v. Des Moines City Railway Company, 199 Iowa 1256, at page 1258, 202 N. W. 762, 763, this court said:

"While the plaintiff restricted his direct examination, he nevertheless laid the basis for certain inferences, more particularly the inference that the witness saw the peril of the occupants of the truck, and could have stopped his car in time to avoid it. The cross-examination was directed and confined to that inference, and was proper."

The sole purpose of the examination of Florene Lyon in the discovery proceeding was to attempt to have the inference drawn that A. M. Reeves having originally purchased the bonds they remained his property. That part of the evidence that appellant did not offer, consisting mainly of cross-examination, was directed to that inference and was proper. Even if the testimony of Florene Lyon and Treacy O'Conner was excluded from this record, the testimony of C. E. Dyer, the disinterested party, was sufficient to support the finding of the trial court.

Some other errors are alleged, all of which have been given careful consideration. The trial court came to the only conclusion that could be reached upon this record.

It necessarily follows that judgment and decree must be, and it is hereby, affirmed.—Affirmed.

Chief Justice and all Justices concur.